Defendant-appellant David Christman appeals his conviction of murder which was entered in the Monroe County Common Pleas Court. On October 31, 1996, a jury convicted appellant of murdering Rena Christman on November 25, 1984, the date that she disappeared. For the following reasons, appellant's conviction is affirmed.
 I. STATEMENT OF FACTS
Appellant married Rena in February 1978 while touring India in search of a wife. After obtaining immigration clearance, Rena moved into appellant's trailer in Woodsfield, Monroe County, Ohio. Two children were born of the marriage. After receiving a master's degree in education, Rena found a job in Gallipolis, Gallia County, Ohio. Thereafter, she moved into an apartment in said town with her children, leaving appellant in Woodsfield.
In August 1983, appellant and E. Hakim, a friend of Rena's family, were walking on farm land owned by appellant's parents. Appellant allegedly stated that if a body were placed in the nearby woods, it would be difficult to find. Appellant also supposedly told E. Hakim that he was going to pour cement at a site where he was building a house and that it would be hard to find a body buried in concrete. Closer to the time of Rena's disappearance, appellant suggested to Rick and Tammy McClelland that he may go to Wheeling, West Virginia to hire someone to kill Rena as he wanted to ensure his custody of the children should Rena divorce him.
In a letter to Rena's mother in India dated April 16, 1984, appellant wrote that Rena was not behaving in the subservient manner that he expected and called Rena manipulative, arrogant, and serpent-like. David Erb testified that in 1984 appellant stated that the worst mistake he ever made was to marry an educated woman. In the fall of 1984, appellant told his brother, Dean Christman, that Rena told him to use a prostitute to satisfy his needs.
About one month before Rena's disappearance, appellant asked his father for advice on a good way to dispose of a body. Rena's sister stated that Rena called her three weeks before her disappearance and disclosed that she was leaving appellant. On November 9, 1984, Rena withdrew money from her checking account and bought a $2,000 certificate of deposit in her and her son's name. On November 17, 1984, Rena rented a safe deposit box and placed in it her jewelry, the certificate of deposit, her passport, her children's passports, and an affidavit. After Rena disappeared, appellant removed the items from the box. Consequently, the contents of the affidavit are unknown.
Rena brought the children to Woodsfield for Thanksgiving. On Friday, November 23, 1984, Rena and appellant shopped at the Ohio Valley Mall in Belmont County. The next day, they attended the wedding of appellant's sister. On November 25, 1984, Rena went to appellant's parents' house. Rena was scheduled to work the next day and was allegedly planning on making the more than two hour drive back to Gallipolis that night.
Dean Christman testified that appellant and Rena argued in the driveway of his parents' house with Rena calling appellant "white trash" and appellant demanding to finish the discussion at home. Although Rena's car was packed with food from the wedding, she left the house with appellant in his car and went to their trailer located on his parents' property. Dean then saw them leave the property and drive by on the main road. While he did not see them return to the trailer, Dean heard the distinctive sound of appellant's car door shut and the sound of the car coast to a start down the driveway of the trailer around 3:00 p.m. Two people reportedly saw appellant alone in his car at 4:00 p.m. in Woodsfield.
At 7:30 p.m., appellant reported Rena missing to mall security at the Ohio, Valley Mall which is almost one hour away from Woodsfield. He claimed that he let his wife out of the car around 3:30 p.m., parked the car, entered the mall, walked around, and then went to their planned meeting spot at 6:00 p.m. When Rena failed to arrive on time, appellant had her paged and searched the stores for her. At 8:10 p.m., when appellant was filing a police report, he stated that he arrived at the mall at 2:30 p.m. Three defense witnesses, two of them appellant's relatives, testified that they saw appellant at the mall that day. One of these witnesses said it was between 2:00 and 5:00 p.m., one said between 2:30 and 3:00 p.m., and one said between 3:00 and 4:00 p.m.
A videotape made by a reporter shows that Rena left her purse at appellant's parents' house that day. The reporter testified that appellant believed his wife got lost or that Hani Krishnas kidnapped her. Rena's sister testified that appellant called her in London and told her that Rena took the children to the mall, left them in the car, and never returned.
Appellant was a suspect in Rena's disappearance from early on. The day after the disappearance, Dean Christman and appellant's father looked in old wells for a body and checked to make sure the backhoes had not been moved. Rick and Tammy McClelland also checked their property where appellant was doing construction work. That same day, appellant's father caught appellant preparing to go to Gallipolis with a truck and remove all of Rena's belongings from her apartment. Appellant decided not to go that day after his father stated that he should not go unless he knew that Rena was not coming back. Within two weeks, appellant removed Rena's possessions from her apartment and retrieved her security deposit from the landlord.
In December 1985, appellant applied for social security survivor benefits. Near this time period, appellant allegedly told a babysitter, Hattie King, that he fed part of Rena's body to the hogs and buried the other part of her body under his hot tub in the basement. Years later, appellant saw Hattie King at a county fair and asked her whether she talked to anyone about what he told her.
Appellant once angrily told Penny Jones, who would not let him into her house, that if she did not listen to him then she would be "gone like her." From late 1986 until early 1987, he talked to Laura Thomas whose advertisement he answered in a Christian newspaper. He told her three different versions of his wife's disappearance. Regrettably, many of the aforementioned witnesses did not come forward with their stories until the mid-1990's.
In August 1987, appellant married a woman from the Philippines whom he contacted through an advertisement. In September 1987, he filed a complaint for divorce against Rena in Monroe County which was dismissed due to a lack of evidence that Rena was willfully absent. In August 1988, he filed a complaint for divorce in Gallia County which was granted. In 1990, appellant had Rena declared dead in probate court. In March 1996, while appellant was discussing the police investigation with his sister, Holly, he said, "Don't they realize by now I would have moved the body."
On May 17, 1996, appellant was indicted for Rena's murder. Search warrants were issued for his house and property two weeks after the indictment was issued; however, the searches proved unfruitful as no body was recovered. Before trial, appellant filed various motions which included a motion to dismiss for failure to timely prosecute and a motion to dismiss for failure to prove venue. These motions were overruled, but the trial court suggested that they be revisited after the close of the state's evidence. The case proceeded to a jury trial, and at the close of the state's case-in-chief, the court again denied appellant's motions. On October 30, 1996, appellant was convicted of murder and sentenced to serve fifteen years to life in prison. Appellant filed notice of appeal.
On October 31, 1997, appellant filed a motion to set aside his conviction based upon the newly discovered fact that one of the jurors who voted to convict him had not disclosed his felony record of forgery. The prosecutor in appellant's case was also the prosecutor at the juror's 1991 guilty plea. Therefore, appellant alleged that the juror and the prosecutor engaged in misconduct by failing to disclose the juror's past. On December 8, 1997, the court denied appellant's motion stating that the juror had been returned to his civil rights and that the prosecutor's failure to disclose was harmless error. Appellant filed timely notice of appeal and submitted a single brief for both appeals.
 II. ASSIGNMENT OF ERROR NO. ONE
Appellant sets forth twelve assignments of error, the first of which contends:
 "IT IS PREJUDICIAL ERROR TO DENY A MOTION TO DISMISS WHEN AN UNJUSTIFIABLE DELAY BETWEEN THE COMMISSION OF AN OFFENSE AND THE INDICTMENT RESULTS IN ACTUAL PREJUDICE DENYING DEFENDANT DUE PROCESS OF LAW UNDER
 SECTION 16, ARTICLE I, OF THE OHIO CONSTITUTION AND THE FIFTH AND FOURTEENTH
 AMENDMENTS TO THE UNITED STATES CONSTITUTION."
In order to determine whether pre-indictment delay has deprived a defendant of due process, a two-part test is utilized. First, the defendant must demonstrate that he was actually or substantially prejudiced by the pre-indictment delay. State v.Whiting(1998), 84 Ohio St.3d 215, 217, confirming State v. Luck
(1984), 15 Ohio St.3d 150, and citing United States v. Lovasco
(1977), 431 U.S. 783 and United States v. Marion (1971),404 U.S. 307. The burden then falls upon the state to produce evidence of a justifiable reason for the delay. Id. Accordingly, evidence of prejudice, by itself, is insufficient to support a claim of due process denial. Luck, supra at 154. The prejudice must be viewed in light of the state's reason for the delay. Id.
In order to determine whether pre-indictment delay resulted in actual prejudice to appellant at trial, any prejudicial factors cited by appellant must be balanced against the other evidence. See Id. The prejudicial factors cited by appellant are as follows:
 "1. 11 1/2 years elapsed between disappearance on November 25, 1984 and indictment on May 17, 1996.
 2. Death of material witness, i.e. David's mother died in 1991.
 3. Telephone records no longer available to confirm or dispute alleged calls made by Rena to her sister, Pritti Hakim and to other persons which might establish other reasons for her disappearance.
 4. Pritti Hakim and Pushpa Lyall destroyed most of Rena's letters.
 5. Scientific tests for blood stains are not effective after the passage of time preventing Appellant from showing the absence of blood stains in his car or from him presenting evidence that there may have been evidence of foul play in her Gallipolis apartment.
 6. The carpeting in the Gallipolis apartment had dark, unexplained stains according to the landlord.
 7. Some state witnesses had no adequate recollection without being refreshed. See testimony of Sandra Erb who had no independent recollection of portions of her testimony.
 8. Social Security Records of application for benefits had been destroyed and employee Brad Dawes could not supply information regarding stated cause of death or how proof of death was being established.
 9. Witness Penny Jones, who testified that David threatened her in 1985, could not recognize him "because he was Younger then.
 10. Public transportation records are no longer available to determine if Rena had traveled elsewhere on or after the date of her disappearance.
 11. Procedural rules have changed regarding proof by circumstantial evidence since 1987, therefore affecting appellant's trial in a significant and material way." (Citations omitted)
We begin our analysis of the prejudicial factors enumerated in appellant's brief by stating that an extended delay is not per se prejudicial. See Luck, supra at 154. In accordance appellant's first factor does not demonstrate actual prejudice. Appellant's second factor, that his mother is dead, is also not substantially prejudicial. Speculation as to the contents of lost testimony does not meet the defense's burden. Marion, supra at 326 (holding that the defendant cannot rely solely on the "possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost"). See, also,United States v. Doerr(C.A.7, 1989), 886 F.2d 944, 964 (holding that the defendant must show the exculpatory value of the testimony). Appellant does not claim that his mother was with him at the mall. Her materiality is speculative. Cf. Luck, supra where two key witnesses had died during the delay.
The unavailability of telephone records to dispute that Rena called her sister on the date testified to is barely relevant. Moreover, the lack of records which may have shown Rena was in contact with a stranger is speculative at best. Further, we cannot assume that the fact that Rena's mother and sister did not save most of Rena's letters is a result of pre-indictment delay. Even if appellant was indicted earlier, these letters may have already been discarded.
As to appellant's fifth enumerated prejudicial factor, his inability to utilize scientific tests to prove that there was no blood in his car, may be somewhat prejudicial to appellant's defense. However, there is no allegation that said tests would be effective in 1987, which is the year that appellant argues is the latest date during which he could have been properly indicted. In fact, Monroe County Sheriff Fred Sirianni was told that luminal, a blood detecting chemical, would not work in 1987, three years after Rena's disappearance. The fact that the carpet in Rena's Gallipolis apartment cannot be tested is not prejudicial for the landlord described the stain as being black like a burn. Moreover, there was no evidence that Rena returned to her apartment, more than two hours away from Woodsfield and more than three hours away from the mall, on the day of her disappearance.
Appellant's seventh cited factor complained about Sandra Erb's poor recollection. Because her testimony seems inconsequential, appellant was not prejudiced by this factor. Moving to appellant's eighth factor, we fail to see how the lack of records from the social security administration prejudiced his defense. There is no allegation that these records are exculpatory. The ninth factor cited by appellant is that Penny Jones, due to appellant's aging, could not make an in-court identification of appellant as the man who broke the handle off of her storm door and threatened that she would be "gone like her." Ms. Jones testified that a man with two small children knocked on her door, identified himself as David Christman, and asked why she would not take his phone calls. This inability to identify appellant due to aging which resulted from the delay is somewhat prejudicial. The fact that public transportation records are no longer available to determine if Rena left voluntarily is not substantially prejudicial. It is highly unlikely that a recently naturalized woman of Indian origin with a mother in India and a sister in London would leave her passport, money, and purse behind if she were purposefully leaving her husband and two young children.
The last factor cited to as being prejudicial due to the preindictment delay is the fact that in State v. Jenks(1991),61 Ohio St.3d 259, the Court lessened the burden of proof so that the state need only prove its theory of the case beyond a reasonable doubt and no longer must disprove any reasonable theories of innocence offered by the defense. Id. at 274, overruling State v. Kulig(1974), 37 Ohio St.2d 157. This case law change does not violate the constitutional prohibition of ex post facto laws as appellant suggests. State v. Webb(1994),70 Ohio St.3d 325, 331 (holding that Jenks is constitutionally applicable to the prosecution of crimes which occurred both before and after the Jenks opinion was released)
Even if we accept appellant's argument that he was substantially prejudiced by the pre-indictment delay, the state presented justifiable reasons for said delay. The prosecutor argued that more than half of the evidence in the case was unknown until approximately one year before the indictment. Appellant argued that he should have been indicted in 1987 which is when the sheriff informed him that he had gathered enough evidence to ask for an indictment. However, the sheriff's threat was merely an interrogatory tool. Moreover, it is not the sheriff who makes the decision that there exists enough evidence to seek an indictment, and courts may not abort criminal prosecutions solely because they disagree with the prosecutor's exercise of discretion on when to seek an indictment. Lovasco, supra at 790.
Preindictment delay is unjustifiable when:
 "* * * the state's reason for the delay is to intentionally gain a tactical advantage over the defendant, see United States v. Marion, supra, or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased." Luck, supra at 158.
In Luck, the Court found the preindictment delay to be unjustifiable because the prosecution commenced its case against the defendant after a fifteen-year stand-still in the investigation without one shred of new evidence. Id. at 158-59. Conversely, the case at bar is distinguishable. There existed no error in judgment or negligence which ceased activity on Rena's case with a subsequent realization of the mistake resulting in an indictment based on substantially the same evidence that was previously possessed by the state. In fact, new evidence arose prior to the indictment to change and strengthen the state's case.
As is apparent from the record, a multitude of witnesses did not reveal what they knew or heard until shortly before the indictment was issued. For instance, the friend who heard appellant point out two good places to hide a body did not tell police about this conversation until January 1993 when he responded to a letter from the police. Dean Christman did not tell the police his story until 1995, after he saw a news story on people who disappeared. Hattie King, the babysitter to whom appellant confessed to feeding half of Rena to the hogs and burying half of her under the basement, came forward in July 1995 and testified that she was too scared to come forward earlier. Appellant did not make the statement to his sister about moving the body until March 1996. The couple who heard appellant state that he may hire someone from Wheeling to kill Rena did not inform the police until May 1996. Appellant's father's story about appellant inquiring about a good method to dispose of a body was not revealed to authorities until a few days before trial. Furthermore, Sheriff Sirianni testified that much of the information was developed within the two years before trial.
[P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."Lovasco,.Supra at 791. Moreover, investigative delay does not violate a defendant's right to due process "even if his defense might have been somewhat prejudiced by the lapse of time." Id. at 796. Under the circumstances of the case at bar, the complexity of investigating a potential murder without a body combined with late witness revelations aptly justifies the eleven and one-half year delay from commission of the offense until indictment. Accordingly, appellant's first assignment of error is overruled.
 III. ASSIGNMENT OF ERROR NO. TWO
Appellant's second assignment of error alleges:
 "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY FAILING TO DISMISS THIS ACTION FOR FAILURE TO ESTABLISH VENUE CONTRARY TO THE PROVISIONS OF SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION, CRIM.R. 18 (A), AND R.C. 2901.12."
Venue of a criminal case shall be that as provided by law. Crim.R. 18 (A). A defendant has the right to a trial by an impartial jury from the county in which the crime is alleged to have occurred. Section 10, Article I, Ohio Constitution. Although venue is not a material element of an offense, the prosecution has the burden of proving beyond a reasonable doubt that the alleged offense was committed in the county where the trial is held. State v. Headley(1983), 6 Ohio St.3d 475, 477; State v. Draggo (1981), 65 Ohio St.2d 88, 90. Venue need not be established expressly as long as it is proven by the totality of the facts and circumstances in the case. Headely, supra at 477;State v. Gribble(1970), 24 Ohio St.2d 85, 89-90.
In the case at bar, appellant claims that the state did not set forth sufficient evidence to warrant a finding that Rena's murder took place in Monroe County, the seat of the trial. He claims that it could have taken place in Belmont County or in West Virginia. However, there was absolutely no evidence presented which would lead a reasonable trier of fact to believe that the murder took place in West Virginia. The state concedes that evidence was presented which could lead a rational fact-finder to believe that the murder occurred in Belmont County. The state therefore cites R.C. 2901.12(G) which was quoted by the court in its instructions to the jury and which provides:
 "When it appears beyond a reasonable doubt that an offense or any element thereof was committed in any of two or more jurisdictions, but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any such jurisdiction."
"While Section 10, Article I provides the general rule for venue in criminal prosecutions, R.C. 2901.12 provides specific exceptions to the rule that become applicable in the event it cannot reasonably be determined in which county the crime was committed." State v. Palmer(Feb. 8, 1995), Medina App. No. 2323-M, unreported. In State v. Miller(1989), 63 Ohio App.3d 479, the Twelfth Appellate District, held that where an incident of gross sexual imposition occurred during a trip on a river which runs through and along various counties, the trial can be held in any of the counties that could have been the site of the crime as long as it is proven beyond a reasonable doubt that the crime was committed in one of those counties.Id. at 484-485.
Accordingly, the relevant inquiry is whether the state presented sufficient evidence to prove beyond a reasonable doubt that appellant murdered Rena in either Monroe or Belmont County. This court must review the evidence in a light most favorable to the state and determine whether any rational fact-finder could have found the element of venue proven beyond a reasonable doubt. See State v. Goff(1998), 82 Ohio St.3d 123, citing State v. Jenks (1991), 61 Ohio St.3d 259. See, also, Headley supra. In other words, would the evidence, if believed, convince the average mind beyond a reasonable doubt that the crime took place in Monroe or Belmont County. See Jenks, supra at 273. If the evidence is sufficient to prove that venue lies in one of these counties, then venue was proper in Monroe County. See R.C.2901.12(G).
The evidence supporting that venue lies in Monroe County is as follows: Rena was last seen by people other than appellant in Monroe County. The hiding places for a body suggested by appellant were in Monroe County. A reasonable inference is that Rena would not go to the mall in Belmont County, almost one hour north, without her purse when her car was packed with food to bring to Gallia County, two hours south, especially since she had just made the trip to the mall two days earlier. Moreover, appellant told mall security that he arrived at the mall at 3:30 p.m., but then told police that he arrived at 2:30. However, appellant's brother heard appellant's car in Monroe County at 3:00 or 3:30, and two witnesses saw appellant in his car alone in Monroe County around 4:00. appellant told Rena's sister that he did not go to the mall with Rena but stayed home instead. Further support for Monroe County as venue is the fact that the burial sites appellant disclosed to Hattie King are in Monroe County.
Circumstantial evidence carries the same probative value as direct evidence. Jenks, supra at 273. In accordance, if the aforementioned circumstantial evidence is believed, a reasonable person could find that venue lies in Monroe County. Although Rena was reported missing in Belmont County and appellant claims that is where he last saw her, R.C. 2901.12(G) allows the trial to be conducted in Monroe County. Therefore, even if there is sufficient evidence to prove venue in Belmont County, Monroe County is still an appropriate alternative venue as analyzed above. Accordingly, appellant's second assignment of error is without merit.
 IV. ASSIGNMENT OF ERROR NO. THREE
Appellant's third assignment of error argues:
 "THE TRIAL COURT COMMITED (sic) PREJUDICIAL ERROR BY PERMITTING TESTIMONY OF EXTRAJUDICIAL STATEMENTS OR CONFESSIONS BY THE DEFENDANT WITHOUT PRIOR PROOF OF CORPUS DELECTI (sic)
In May 1987, Sheriff Sirianni interviewed appellant at his house for more than four hours and recorded the conversation. The taped interview was played for the jury. The sheriff testified to four instances where appellant allegedly nodded in response to the sheriff's statements. For example, appellant supposedly nodded in response to two different assertions by the sheriff that they both knew what happened on the day of Rena's disappearance. Appellant also allegedly nodded after the sheriff suggested that appellant should be honest with Jesus and the police. The sheriff also testified that appellant nodded when the sheriff asked if appellant was debating whether or not to tell the police the truth. The sheriff categorized the nods as a tacit confession.
Before trial, appellant made a motion in limine to exclude this "body language confession." The court heard arguments and told appellant to object when the disputed testimony arose during trial. At trial, appellant solely objected to the testimony about one of the nods. As to lack of objections to the remaining mentions of nodding and the sheriff's interpretation of the nods as a confession, appellant asserts plain error. Pursuant to Crim.R. 52(B), plain error may be noticed if such error affects substantial rights.
Appellant posits that such testimony should have been excluded pursuant to the corpus delicti rule set forth in State v. Maranda
(1916), 94 Ohio St. 364, which provides:
 "It has long been established in Ohio that there must be some evidence outside of a confession, tending to establish the corpus delicti, before such confession is admissible. The quantum or weight of such outside or extraneous evidence is not itself to be equal to proof beyond a reasonable doubt, nor even enough to make a prima facie case. It is sufficient if there is some evidence outside of the confession that tends to prove some material element of the crime charged." Id. at syllabus.
The corpus delicti of a crime is proof an of an act and proof of criminal agency. State v. Van Hook(1988), 39 Ohio St.3d 256,261; State v. Edwards(1976), 49 Ohio St.2d 31, 34. More specifically, the corpus delicti of murder is proof that the decedent was unlawfully (the criminal agency) killed (the act)State v. Manago(1974), 38 Ohio St.2d 223, 226-27. To prove corpus delicti sufficient to allow an extrajudicial confession to be introduced at trial, the state need not show the manner of death or produce other evidence, besides the confession, of the defendant's connection with the crime. State v. Knapp(1904),70 Ohio St. 380, 397. Nor must the state show purpose at this juncture in the trial. See Maranda, supra (stating that the evidence need only support some element of the crime, not all of the elements)
It follows that we must solely determine whether there is "some evidence," outside of the head-nodding testimony, that tends to prove a material element of murder. See Id. Such evidence may be circumstantial. State v. Nicely(1988), 39 Ohio St.3d 147,154-55. Upon review of the record, we find sufficient evidence dehorsthe head-nodding testimony to meet the corpus delicti requirement. For instance, at the time of trial, Rena had been missing for almost twelve years. She left her purse, passport, and money behind. Rena allegedly went missing from a mall hours before she was to drive back to her apartment. She left her car packed with food behind. Testimony established that she was not the type of person to leave her children. Testimony also demonstrated that Rena had no contact with friends or family after her disappearance. This evidence tends to show that Rena is not voluntarily missing but that she is dead by unlawful means. See Nicely, supra at 152-153 (holding that circumstantial evidence such as the aforementioned is sufficient to prove the death of the victim and citing People v. Scott(1959),176 Cal.App.2d 458, a case with similar circumstantial evidence)
Moreover, the state cites to State v. Nobles(1995), 106 Ohio App.3d 246, wherein the Second Appellate District held that various accounts by the defendant about how the victim came to be missing and testimony that the defendant did not indicate any interest in the police investigation constitute "some evidence" tending to prove an element of murder. Id. at 263-64. Similarly, in the case at bar, appellant told mall security that he arrived at the mall at a time different from what he told police officers an hour later. Thereafter, appellant allegedly told Rena's sister that he stayed home while Rena took the kids to mall. Furthermore, testimony established that appellant did not display any curiosity about the police investigation as he never inquired into the status of the search.
In response to appellant's insistence that this court realize the importance of the fact that no body was ever recovered, the state quotes Nicely, supra wherein the Supreme Court held:
 "The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward." Id. at 156, quoting People v. Manson(1977), 71 Cal.App.3d 1, 42.
Finally, we should point out that the sheriff's testimony is not actually the introduction of an extrajudicial confession. Although he opined that appellant tacitly confessed, this is solely his interpretation of appellant's gestures. It is not a confession in the traditional sense of the word as contemplated by the corpus delicti rule. The nods are merely pieces of circumstantial evidence and are not likely encompassed by the requirements of corpus delicti cases.
For all of the preceding reasons, appellant's third assignment of error is overruled.
 V. ASSIGNMENT OF ERROR NO. FOUR
Appellant's fourth assignment of error reads:
 "A. IT IS PREJUDICIAL ERROR FOR A JUROR TO DENY A PRIOR FELONY CONVICTION ON VOIR DIRE EXAMINATION."
 "B. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY DENYING APPELLANT'S MOTION FOR NEW TRIAL WHEN IT WAS DISCOVERED THAT A JUROR HAD FAILED TO DISCLOSE A PRIOR FELONY CONVICTION."
 "C. IT IS PROSECUTORIAL MISCONDUCT FOR THE STATE NOT TO DISCLOSE THAT A JUROR HAD BEEN PROSECUTED AND CONVICTED BY THE TRIAL PROSECUTOR."
On September 20, 1991, Kirk Blackstone pled guilty to forgery, a fourth degree felony, in the Monroe County Common Pleas Court. The prosecutor was Richard Yoss, the attorney who would later prosecute appellant's case. After a pre-sentence investigation, Mr. Blackstone was sentenced to one and one-half years with all but thirty days suspended plus five years of probation. Mr. Blackstone was discharged from probation more than two years early due to good behavior and "restored to all civil rights" pursuant to R.C. 2961.01. See Committee Comment citing to R.C.2951.09.
In October 1996, Mr. Blackstone sat as a member of the jury in appellant's case. During voir dire, the court asked the following of the entire panel:
 "THE COURT: * * * Have any of you been convicted of a serious crime which by law renders you disqualified to serve as a juror? That would be either a felony or a serious offense. THE PROSPECTIVE JURORS: (No audible response)
 THE COURT: This is a general question to everybody. Has anyone in this body been convicted of a felony?
 THE PROSPECTIVE JURORS: (No audible response)." (Jury Selection Tr. 8-9)
Appellant's case proceeded through trial, and the jury found appellant guilty of murder on October 31, 1996. In February 1997, Mr. Blackstone was indicted for engaging in sexual conduct with a thirteen year old girl in June 1996. On May 19, 1997, the trial court called the state and appellant's counsel to the courtroom and informed them that, during Mr. Blackstone's pre-trial, the court discovered his 1991 felony conviction. When appellant's counsel orally requested a new trial, the court instructed counsel to file a written motion. Appellant filed such a motion five and one-half months later on the grounds of misinformation provided by Mr. Blackstone during voir dire and prosecutorial misconduct for non-disclosure. The court denied the motion without a hearing in December 1997.
Appellant explicitly states that he does not dispute that Mr. Blackstone was legally qualified to serve due to the court's restoration of Mr. Blackstone's civil rights. However, appellant claims that the court should have granted a new trial pursuant to Crim.R. 33(A)(2) based upon juror misconduct and prosecutorial misconduct which materially affected his substantial rights.
Such a motion must be made fourteen days after the verdict unless "the defendant was unavoidably prevented from filing his motion, in which case the motion shall be filed within seven days from the order of the court finding that defendant was unavoidably prevented from filing such motion within the time provided herein." Crim.R. 33(B). See, also, State v. Schiebel
(1990), 55 Ohio St.3d 71, 76 (holding that Crim.R. 33(A)(2) is the provision applicable to juror misconduct, not Crim.R. 33(A) (6) dealing with newly discovered evidence even if the juror misconduct is newly discovered)
On May 19, 1997, more than fourteen days after the verdict, appellant orally moved for a new trial. By ordering appellant to file a written motion, the trial court implicitly found that appellant was unavoidably prevented from filing within the fourteen day time limit. According to Crim.R. 33(B), the written motion should have been filed within seven days. However, appellant waited five and one-half months. Therefore, appellant's motion was untimely filed in the trial court. Nonetheless, because the trial court considered the motion without dismissing it for failing to timely file, we will continue our analysis.
Pursuant to Crim.R. 33(C), in order to ask for a new trial on the grounds of juror or prosecutorial misconduct, appellant must submit an affidavit showing the truth of the grounds asserted. See State v. Rogers(199), 68 Ohio App.3d 4(holding that without an affidavit the motion is nothing more than counsel's bald assertions of misconduct). Therefore, we need not review the claim of prosecutorial misconduct as there was no sworn statement that Mr. Yoss remembered that he prosecuted the forgery case where Mr. Blackstone pled guilty or other allegations of prosecutorial misconduct. However, we will review the claim of juror misconduct without such an affidavit. Because the trial court was the body who raised the issue of juror misconduct by informing the parties that Mr. Blackstone has a prior felony conviction, an affidavit swearing to such alleged misconduct is unnecessary.
A trial court may not grant a new trial unless the misconduct complained of materially affects substantial rights of the defendant, i.e. it affirmatively appears from the record that the defendant was prejudiced or was prevented from having a fair trial. Crim.R. 33(A)(2) (E)(5). The trial court in the case at bar held that appellant was not prejudiced by the non-disclosure of the juror's felony conviction. "Generally, a trial court's ruling on a motion for a new trial will not be reversed on appeal absent a clear showing that the court abused its discretion." State v. Grant(1993), 67 Ohio St.3d 465,480. See, also, State v. Hawkins(1993), 66 Ohio St.3d 339; Statev. Williams(1975), 43 Ohio St.2d 88. Upon review, we must determine whether the trial court's attitude was unreasonable, unconscionable, or arbitrary when it found that the non-disclosure was harmless. See State v. Keith(1997), 79 Ohio St.3d 514,526. See, also, Blakemore v. Blakemore(1983), 5 Ohio St.3d 217,219 (defining abuse of discretion)
The prejudice alleged by appellant is that Mr. Blackstone was probably biased towards the state because the prosecutor did not object to probation in Mr. Blackstone's forgery case five years earlier. The allegation that Mr. Blackstone, a convicted felon, favored the person who initiated a criminal suit against him is highly speculative. Appellant also argues that his defense was prejudiced by the fact that this same juror had committed a sex crime against a thirteen year old girl a few months before appellants trial. Appellant suggests that Mr. Blackstone performed favorably to the state so that if he were ever caught for his crime, his jury service would be favorably remembered. This statement is even more speculative than the first, and we cannot pronounce a new rule that if a person who served as a juror is later convicted of a crime, then the defendant who was pronounced guilty by that juror is entitled to a new trial. Furthermore, there is no indication that but for Mr. Blackstone's jury service, appellant would not have been convicted.
It was not unreasonable or unconscionable for the trial court to find that non-disclosure of Mr. Blackstone's forgery conviction was harmless. As aforementioned, it is unlikely that Mr. Blackstone was biased for the prosecution or that he failed to disclose for biased reasons. It is more likely that he failed to disclose due to embarrassment, as the question was asked in front of the entire venire. It is also possible that Mr. Blackstone did not understand that the question applied to his past conviction since his civil rights had been restored allowing him to serve as a juror and the judge initially only asked about felonies which make one ineligible to serve. Accordingly, this court cannot say that the trial court committed an abuse of discretion when it found that appellant was not prejudiced. This assignment of error is overruled.
 VI. ASSIGNMENT OF ERROR NO. FIVE
Appellant's fifth assignment of error contends:
 "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING TESTIMONY BY A STATE'S WITNESS THAT DEFENDANT'S `BODY LANGUAGE' CONSTITUTED A CONFESSION."
Appellant argues that the sheriff's testimony stating that appellant tacitly confessed by nodding should have been excluded pursuant to Evid.R. 702 which deals with the admissibility of expert testimony. Expert testimony is defined as that which broaches a subject that is beyond "the ken" of the average juror.State v. Koss(1990), 49 Ohio St.3d 213, 216. Whether a person nodded his head is not a question which requires an expert on body language. Furthermore, testimony that the sheriff believed that appellant's nods constituted a tacit confession is not a concept relating to matters outside of the knowledge possessed by laypersons.
The sheriff's testimony is more properly labeled "opinion testimony by a laywitness" under Evid.R. 701 which provides:
 "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."
The sheriff's testimony that appellant nodded his head is rationally based on personal observation, satisfying the first part of the Evid.R. 701. Additionally, the sheriff's testimony categorizing appellant's nods as a tacit confession did not arise until the state's redirect examination. Upon cross-examination, defense counsel tried to make the sheriff admit that if appellant had confessed then the sheriff would have arrested him. Thereafter, the state developed the sheriff's testimony so that the jury could understand why appellant was not immediately arrested. Moreover, in order to clarify the nods in regards to their context, the state asked if it was the sheriff's opinion that appellant confessed. The sheriff responded that he believed appellant tacitly confessed. Pursuant to Evid.R. 701 (2), this testimony is helpful to the jury in understanding why the sheriff thought the nods were significant. It also aids the trier of fact in comprehending the sheriff's testimony in light of cross-examination by defense counsel. Therefore, the admission of the sheriff's opinion testimony was proper. This assignment of error is overruled.
 VII. ASSIGNMENT OF ERROR NO. SIX
Appellant's sixth assignment of error contends:
 "IT IS REVERSIBLE ERROR TO PERMIT EXPERT OPINION TESTIMONY ON AN ULTIMATE ISSUE FOR THE TRIER OF FACT WHEN SUCH OPINION DEALS WITH MATTERS WITHIN THE UNDERSTANDING OF THE JURY AND THE PROBATIVE VALUE IS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF PREJUDICE CONTRARY TO EVID.R. 702, EVID.R. 704, AND EVID.R. 403(A)
One of the state's witnesses was Agent Herman Henry of the Ohio State Bureau of Criminal Identification and Investigation (BCI), a division of the Attorney General's Office. In September 1985, Agent Henry approached the case of Rena's disappearance as that of a missing person. During his investigation, Agent Henry interviewed Rena's friends, coworkers, and her landlord. On direct examination, the prosecutor asked Agent Henry if there was anything unusual about the facts of this case. Defense counsel objected on the grounds that Agent Henry was not qualified and his answer would be purely opinion. The court overruled the objection stating that Agent Henry was qualified. The prosecutor then asked if Agent Henry had an opinion to which the agent responded, "I believe the person is dead. She is not missing." Agent Henry based this opinion on the various interviews that he conducted which tended to show that Rena was not the type of person to voluntarily disappear.
Appellant argues that the admission of Agent Henry's opinion on Rena's death is violative of Evid.R. 702 which states:
 "A witness may testify as expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by law persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony. (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *."
Admission of expert testimony is within the sound discretion of the trial court whose decision will not be reversed absent an abuse of discretion. Scott, et al. v. Yates(1994), 71 Ohio St.3d 219,221; State v. Williams(1983), 4 Ohio St.3d 53, 58. An abuse of discretion is more than an error of law or judgment but implies an unreasonable, unconscionable, or arbitrary attitude on the part of the trial court. Blakemore v. Blakemore(1983),5 Ohio St.3d 217, 219.
Initially, appellant suggests that the trial court abused its discretion by finding that the state properly qualified Agent Henry as an expert witness pursuant to Evid.R. 702(A)(2). Agent Henry testified that he worked for BCI for twenty-nine years and investigated twenty-five to thirty missing person cases. He described that his job entailed processing crime scenes, collecting evidence, and performing investigative work. This testimony sufficiently reflects that it was not unreasonable for the trial court to determine that Agent Henry had ample special knowledge, skill, experience, and training in his field to be considered an expert investigator of missing persons cases.
Appellant also urges that the court's admission of Agent Henry's opinion testimony is violative of Evid.R. 702(A)(1) because whether or not Rena is dead is not a matter beyond the knowledge or experience possessed by the average juror. Expert testimony is not admissible if the opinion expressed is within "the ken" or range of knowledge of the jury. State v. Koss
(1990), 49 Ohio St.3d 213, 216. Such testimony is only admissible if it is "sufficiently beyond common experience." State v. Buell
(1986), 22 Ohio St.3d 124, 131. Appellant contends that Agent Henry's expert opinion interpreting circumstantial evidence about Rena's disappearance is unnecessary because such interpretation is not beyond the ken of a layperson.
The state argues that laypeople do not normally make judgments on whether or not a missing person disappeared voluntarily or involuntarily; therefore, such a subject is not a matter of common experience. Agent Henry had specialized knowledge in the field of missing persons which the average person lacks. He drew an educated inference from the interviews that he conducted and his expertise. The state therefore argues that the court did not abuse its discretion by permitting Agent Henry to give an expert opinion on Rena's disappearance.
Even assuming arguendo that appellant's argument is more persuasive, the state posits that this assignment of error would still fail because appellant's defense was not prejudiced by Agent Henry's opinion testimony. Appellant must establish that but for the admission of Agent Henry's opinion, the jury would not have found that Rena was dead. See State v. Brown(1992),65 Ohio St.3d 483.
We conclude that appellant cannot demonstrate that the opinion testimony was essential to the jury's determination since there exists other overwhelming evidence that Rena did not voluntarily disappear. For instance, she left her purse, money, passport, and children behind. Additionally, Rena had plans for the near future such as driving back to Gallipolis on the day of her disappearance and going to work and paying the babysitter the next day. Agent Henry's opinion that Rena was dead was only a minute portion of the state's case and was not essential to the jury's conclusion. As the state concludes, the admission of the opinion that Rena is dead is harmless pursuant to Crim.R. 52(A) In accordance, this assignment of error is overruled.
 VIII. ASSIGNMENT OF ERROR NO. SEVEN
Appellant's seventh assignment of error provides:
 "IT IS PREJUDICIAL ERROR IN A CRIMINAL TRIAL TO ADMIT [INTO] EVIDENCE THE RECORD OF A CIVIL ACTION (R.C. 2121.01 PRESUMPTION OF DEATH) OR THE EXISTENCE [sic] OF A CIVIL JUDGMENT TO ESTABLISH FACT ON WHICH IT WAS RENDERED."
Appellant claims that the trial court committed reversible error by denying his motion in limine which sought to exclude the state's introduction of a probate court judgment from a presumption of death action which appellant filed in 1990. A presumption of death action may be filed pursuant to R.C. 2121.02(A)(1) if a person is absent from their domicile for five years. Appellant cites Gee v. State(1899), 60 Ohio St. 485 for the proposition that the admission of a civil court's judgment into a criminal trial mandates reversal.
In State v. Snyder(1952), 157 Ohio St. 15, the Court cited Gee and stated, "The general rule is well established that the introduction of the record of a judgment in a civil action is not admissible in a criminal prosecution to establish the facts essential to a conviction." Id. at 19 (Emphasis added). Both Gee and Snyder were cases dealing with the inadmissibility of a civil patermty action to prove criminal non-support. These cases stress that the elements of a criminal case must be proven beyond a reasonable doubt; therefore, a civil judgment against a defendant cannot be substituted for proof of one of the elements of a criminal case against that defendant. See State v. Harding
(1992), 81 Ohio App.3d 619, 622, citing State v. Nelms(Oct. 6, 1981), Franklin App. No. 81AP-339, unreported.
Conversely, in the case at bar, the probate action was not introduced as a substitute for proof that Rena was dead or to prove an essential element of murder. The judgment and testimony identifying the judgment were merely introduced to demonstrate one of the many examples of appellant's varying versions of Rena's disappearance. Specifically, the evidence showed that Rena disappeared on November 25, 1984; however, appellant's probate complaint claimed that she disappeared on an unspecified day in December 1984. Further, as discussed in assignment of error number six, there existed other evidence which circumstantially proved beyond a reasonable doubt that Rena was dead.
Appellant also contends that his defense was prejudiced by the fact that Sheriff Sirianni testified that he considered the presumption of death to be tangible evidence of Rena's death. However, this testimony was solely an opinion by the sheriff. Moreover, the opinion testimony was elicited by defense counsel upon cross-examination. After the sheriff declared his belief that the presumption of death constituted tangible evidence, defense counsel stated that a presumption is rebuttable and told the sheriff that he did not agree with his characterization of the presumption as tangible. Nevertheless, no objection or motion to strike the sheriff's answer was entered.
Even assuming all reference to the presumption of death action should have been omitted from evidence, its admission did not prejudice appellant's substantial rights. As previously stated, the presumption of death order was not a substitute for proof beyond a reasonable doubt that Rena was dead; other evidence circumstantially proved this element. Accordingly, appellant's seventh assignment of error is overruled.
 IX. ASSIGNMENT OF ERROR NO. EIGHT
Appellant's eighth assignment of error provides:
 "IT IS PREJUDICIAL ERROR TO ALLOW CLEARLY INADMISSIBLE EVIDENCE OF THE DEFENDANT'S REFUSAL TO TAKE A POLYGRAPH EXAM TO GO BEFORE A JURY WHEN SUCH EVIDENCE CAN BE DELETED FROM AUDIOTAPES AND TRANSCRIPTS PRIOR TO SUBMISSION."
This assignment of error arises from the following portion of Sheriff Sirianni's May 27, 1987 taped interview of appellant:
 "SHERIFF SIRIANNI: * * * Well, it's just like with poly, for example. I think on two separate occasions you had refused the poly, and, of course, most persons — Again, we're talking about probable cause here, we're not talking proof beyond a reasonable doubt at this point. But most persons would have said, yeah, I'll do anything to help the situation. But you didn't.
DAVE CHRISTMAN: Well, —
SHERIFF SIRIANNI: That creates —
 DAVE CHRISTMAN: — at the bottom of the (inaudible) application, it said something about make a call to your lawyer, so I decided, yeah, I would do that. And he said, first of all, what international agencies are they talking about? He said that's why they wanted to do a poly, so they could have a reason to consult. They had to have a reason.
 SHERIFF SIRIANNI: They probably wanted to put a poly on you so they could eliminate you as a suspect.
 DAVE CHRISTMAN: Well, first of all, there aren't any international agencies, and, he said, second of all, the polygraph had been proven to be very (inaudible). * * *
 SHERIFF SIRIANNI: But the thing is, shit, it can't be used in court. It couldn't be used in court against you, but it could have speeded things up as far as investigative work at that point. But if my wife came up missing and they were gonna — I took at poly once before, you know, when I (inaudible) police department (inaudible) And I wasn't happy about. I felt like a can of sardines that had just been opened afterwards. But if it was a situation where a loved one was missing and it was a tool which could help in any way, even to the point of eliminating me as a suspect so he could get on with the investigation, hell, yeah, I would do it. I would do it in a flash.
 DAVE CHRISTMAN: They said it wouldn't eliminate me as a suspect anyway." (5/27/87 Interview Tr. 78-79)
The results of a polygraph test are not admissible unless the parties stipulate in writing to the admission of the results.State v. Jamison(1990), 49 Ohio St.3d 182, 190; State v. Souel
(1978), 53 Ohio St.2d 123, 126. "[S]ince it is uniformly held that such a test is not judicially acceptable, it reasonably follows that neither a professed willingness nor a refusal to submit to such a test should be admitted." State v. Hegel(1964),9 Ohio App.2d 12, 13, citing State v. Smith(1960), 113 Ohio App. 461.
Before the taped interview was played for the jury, the parties discussed the part of the tape mentioning appellant's refusal to take the polygraph test. Both defense attorneys stated that they would rather not edit the tape because it would be worse for the jury to speculate on what was cut out of the tape. The defense opted for a limiting instruction by the court instead of editing the tape. The court agreed and declared that the instruction would be worked out later. The court's instructions to the jury at the end of the case read in pertinent part:
 "There has been a mention of a polygraph during the interview between Sheriff Sirianni and the defendant. You are to disregard any and all reference to a polygraph during your deliberations." (Trial Tr. VI-102).
Appellant argues that the limiting instruction on the polygraph was both untimely and insufficient to cure the prejudicial effect. Because no objection to the timing or the sufficiency of the limiting instruction was lodged with the trial court, appellant proceeds under a plain error analysis. Pursuant to Crim.R. 52(B), a reviewing court may take notice of a plain error which affects substantial rights. An unobjected to error constitutes reversible error only in exceptional circumstances where the error created a manifest miscarriage of justice. Statev. Phillips(1995), 74 Ohio St.3d 72, 83; State v. Moreland
(1990), 50 Ohio St.3d 58, 62. The error complained of must be so serious that without such error the result of the trial would have been different. Id.
Appellant contends that the court should have added to its instruction that the results of a polygraph examination are not scientifically acceptable and that a suspect has a right to refuse to take such an exam. However, in State v. Holt(1969),17 Ohio St.2d 81, the Court determined that after a police officer testified that the defendant failed a polygraph test, a curative instruction which ordered the jury to disregard the remark was sufficient. Id. at 84. Jurors are presumed to follow curative instructions. State v. Loza(1994), 71 Ohio St.3d 61, 75; Statev. DePew(1988), 38 Ohio St.3d 275, 285. Therefore, the content of the instruction given by the trial court in the case at bar was sufficiently curative and as such was not plain error.
Appellant next argues that the trial court should have given the curative instruction immediately after the jury heard the portion of the tape containing the discussion about the polygraph. In Holt, the trial court gave the instruction immediately following the police officer stated that the defendant failed the test. However, in Holt, the need for a curative instruction was more pressing because the improper testimony was elicited by the state from the state's witness, whereas in the case at bar, the polygraph references were in an unredacted tape the contents of which the defense had prior notice. Moreover, in Holt, the police officer stated that the defendant failed the test. This testimony is more prejudicial than a conversation where appellant explained that he refused to take the test upon the advice of an attorney.
Furthermore, appellant's attorneys chose to keep the taped interview intact without redacting the part referring to a polygraph. "[T]he defense cannot invite error and later complain about its prejudicial effect on appeal." State v. Spirko(1990),59 Ohio St.3d 1, 8. See, also, State v. Kniep(1993), 87 Ohio App. 681,686 (holding that when testimony regarding a defendant's refusal to take a polygraph is elicited by the defense, the invited error doctrine prohibits the defendant from asserting the error on appeal), citing State v. Woodruff(1983),10 Ohio App.3d 326, 327; State v. Hill(187), 37 Ohio App.3d 723,75-76. The court told the parties that the instruction's contents would be worked but later. This impliedly informed appellant that the curative instruction would be given at the end of the trial. Appellant did not ask the court to give the instruction during the playing of the tape. Furthermore, under the plain error analysis, we cannot say that if the limiting instruction had been given sooner, the result of the trial would have been different. Accordingly, the court's instruction did not result in reversible error. This assignment is without merit.
 X. ASSIGNMENT OF ERROR NO. NINE
Appellant's ninth assignment of error claims:
 "FAILURE TO CONDUCT AN IN CAMERA INSPECTION OF A WITNESS['S] GRAND JURY TESTIMONY IS PREJUDICIAL ERROR WHEN THE RECORD ESTABLISHES THAT THE DEFENSE HAS A PARTICULARIZED NEED FOR SUCH TESTIMONY."
After the direct testimony of appellant's brother, appellant made the following motion:
 "Our motion is, on the Grand Jury, Mr. Christman, Dean Christman, did testify before the Grand Jury, we have not — the Court is well aware, everybody is aware, we have not seen his testimony, we believe there may be inconsistencies and what we're asking the Court to do is simply have his portion of the Grand Jury testimony typed up for the Court's review and if there are inconsistencies, then we would ask to be permitted to use that because he did testify under oath in a court proceeding. If there aren't any inconsistencies, then we obviously wouldn't see it and wouldn't use it." (Trial Tr. III-99-100)
The court denied said motion as appellant failed to establish a particularized need for the grand jury testimony.
Grand jury proceedings are secret. State v. Greer(1981),66 Ohio St.2d 139, 147-48, citing State v. Patterson(1971),28 Ohio St.2d 181. Unless a particularized need is established, defendants have no right to inspect grand jury transcripts. Id. A particularized need exists "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial." State v. Sellards(1985),17 Ohio St.3d 169, 173. A trial court's determination of whether there exists a particularized need for the inspection of grand jury testimony will not be reversed absent an abuse of discretion. State v. Webb(1994), 70 Ohio St.3d 325, 337, citingGreer, supra.
In front of the trial court, appellant merely stated that the need for inspection was the right to know if Dean's grand jury testimony differed from his direct trial testimony. However, "general assertions, citing no specific facts of record, do not establish particularized need." Webb, supra at 337. See, also,State v. Richey(1992), 64 Ohio St.3d 353, 356. Appellant currently argues that particularized need for an in camera review of Dean's grand jury testimony exists because Dean's testimony was allegedly inconsistent with that of Clayton Christman Jr., and Dean was hostile to appellant. Even assuming arguendo appellant had argued before the trial court what he now argues before this court, he still would not have established a particularized need. Dean's testimony was not so much inconsistent with Clayton's as it was simply based upon different observations. Moreover, that a person may have reason to dislike the defendant is not enough to show a particularized need for grand jury testimony.
Appellant's "need" for Dean's grand jury testimony could apply in any case with any witness who previously testified before a grand jury. This interpretation of the particularized need test is too expansive. Where a defendant's only showing of particularized need is mere speculation that grand jury testimony of a witness might be inconsistent with trial testimony, the trial court does not abuse its discretion by denying the defendant's motion for an in camera inspection. State v. Henness
(1997), 79 Ohio St.3d 53, 62; State v. Mack(1995), 73 Ohio St.3d 502,508. Accordingly, the trial court exercised sound discretion when it overruled appellant's motion for an in camera inspection of Dean Christman's grand jury testimony. This assignment of error is without merit.
 XI. ASSIGNMENT OF ERROR NO. TEN
Appellant's tenth assignment of error contends:
 "APPELLANT WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION, BY TRIAL COUNSEL'S NUMEROUS SERIOUS ERRORS OCCURRING THROUGHOUT THE COURSE OF THE CASE."
In order to prevail on a claim of ineffective assistance of counsel the defendant has the burden to prove two things: (1) that defense counsel's performance was deficient and (2) that counsel's ineffectiveness prejudiced the defense. State v.Reynolds(1998) 80 Ohio St.3d 670, 674, citing Strickland v.Washington(1984), 466 U.S. 668, 687. Counsel's performance is deficient if it falls below an objective standard of reasonableness. Id. See, also, State v. Peterson(Mar. 6, 1998), Jefferson App. No. 96-JE35, unreported, 4; In re Roux(Aug. 24, 1998), Noble App. No. 238, unreported, 2. The defendant must produce evidence that counsel acted unreasonably by substantially violating essential duties to the client:. State v. Sallie
(1998), 81 Ohio St.3d 673, 674, citing State v. Keith(1997),79 Ohio St.3d 514, 534. Because attorneys are presumed competent, reviewing courts must refrain from second-guessing strategical decisions and strongly presume that counsel's performance falls within a wide range of reasonable legal assistance. State v.Carter(1995), 72 Ohio St.3d 545, 558. A defendant is not guaranteed the right to the best or most brilliant counsel. Statev. Burley(Aug. 11, 1998), Mahoning App. No. 93-CA-204, unreported, 3.
Upon demonstrating counsel's deficient performance, the defendant then has the burden to establish prejudice to the defense as a result of counsel's deficiency. Reynolds, supra at 674. The reviewing court looks at the totality of the evidence and decides if there exists a reasonable probability that were it not for serious errors made, the outcome of the trial would have been different. Strickland, supra at 695-96. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. See, also, State v. Bellish(Mar. 31, 1998), Mahoning App. No. 87-CA-78, unreported, 4.
Appellant sets forth nine allegations of ineffective assistance of counsel. We will address each allegation separately, determining whether counsel's performance was deficient in each instance and if so whether appellant's defense was prejudiced by the deficiency. Appellant's first allegation of ineffective assistance deals with a missed discovery deadline and the trial court's resulting exclusion of expert testimony on pigs. At the end of the state's presentation of evidence, defense counsel informed the court that they wanted to present the testimony of a "pig doctor" who would briefly testify that it was impossible for pigs to eat a corpse. The state objected as the deadline for disclosing witnesses had long passed. The court agreed and refused to allow the "pig expert" to testify. Appellant states that the missed discovery deadline constituted ineffective assistance of counsel.
We agree that disclosing an expert witness in the middle of a trial constitutes unreasonably deficient performance if the need for such a witness and the availability of a witness was ascertainable before the discovery deadline. As the trial court stated, defense counsel was aware for five months before trial that Hattie King would testify that appellant told her that he fed part of Rena to the hogs and buried part of her under the hot tub. It is unknown whether a "pig expert" who would testify favorably could have been found earlier. However, we assume that a reasonable attorney would have informed the court that they used diligence in searching for an expert and only recently found one if this were in fact the scenario. Accordingly, counsel's performance on this matter appears to have been deficient.
We now must decide if the proceeding was fundamentally unfair making the result unreliable due to the lack of desired expert testimony. Carter, supra at 558. More specifically, we must determine whether there exists a reasonable probability that presentation of the "pig expert's" testimony would have changed the outcome of appellant's trial. Theoretically, had appellant's "pig expert" testified that a pig will not eat human flesh, the state may have been able to produce their own "pig expert" to testify that a pig will eat flesh when it is mixed in with their slop. Moreover, even if the "pig expert" testified without challenge, that would have only served to put a doubt in the jury's mind that pigs ate part of Rena's body. We cannot say that it is reasonably probable that the jury would not have convicted appellant had they heard such testimony. See Sallie, supra 675 (stating that a review of the record must indicate a reasonable probability that presentation of such expert testimony would have changed the trial's outcome)
It must be remembered that the jury heard two witnesses testify that appellant thought about hiring someone to kill Rena. Furthermore, the jury heard three witnesses testify that weeks before Rena's disappearance, appellant talked about ways to dispose of a body. This evidence along with other previously recited circumstantial evidence lead this court to the conclusion that our confidence in the outcome of the trial is not undermined by the failure of defense counsel to timely present the "pig expert." Therefore, appellant's first allegation of ineffective assistance of counsel is overruled.
Appellant's second allegation of ineffective assistance revolves around Shane Pugh's testimony. Mr. Pugh testified that on November 18, 1993, he was running a service line to the house that appellant had been building when Rena disappeared. While digging a trench, Mr. Pugh notice a plastic bag partially exposed in the dirt wall of the trench. Upon further inspection with a stick, Mr. Pugh discovered that the bag contained "long black hair", at least twelve inches long, and "decomposing meat." Mr. Pugh left the bag where he found it, put the lines in the trench, and replaced the dirt. After appellant was indicted in May 1996, Mr. Pugh realized the importance of his prior discovery. Thereafter, Mr. Pugh testified at a search warrant hearing and unsuccessfully assisted in the search for the bag. At trial, Mr. Pugh said the bag was along the line when he saw it in 1993 and that if it: were still there he would have found it when he assisted in executing the search.
Appellant complains that, in response to Mr. Pugh's testimony, defense counsel should have called an expert witness to testify about the decomposition of flesh over time. We disagree that defense counsel's failure to call an expert on decay constituted ineffective assistance of counsel. Counsel's decisions on which witnesses to call fall within the realm of trial strategy and will not usually constitute ineffective assistance of counsel.State v. Clayton(1980), 62 Ohio St.2d 45, 49. As explained inCarter, supra:
 "Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 558. See, also, Sallie, supra.
As the state posits, defense counsel may have strategically decided that the testimony of an expert on flesh decay would have placed unwanted attention on the contents of the plastic bag. Moreover, there is no evidence before this court that an expert on the decomposition of flesh would have provided testimony favorable to appellant. See State v. Coleman(1989), 45 Ohio St.3d 307,308-09. We cannot say that counsel's decision not to call an expert of decomposition was outside of "the wide range of reasonable professional assistance." See State v. Thompson
(1987), 33 Ohio St.3d 1, 10. Therefore, defense counsel's performance was not deficient in this instance.
Appellant next argues that his counsel was ineffective for failing to move to strike Mr. Pugh's testimony which allegedly became irrelevant after two defense witnesses testified that Rena had short hair at the time of her disappearance. A photograph was entered into evidence which showed Rena with her family at a wedding on the day before her disappearance. From the picture, one cannot determine whether Rena's hair is short or she is wearing it pulled back. One witness testified that Rena may have had her hair tied in a french knot at the wedding. Two witnesses testified that her hair was cut short. Plaintiff's exhibit number nine, a missing persons report, contains an entry that Rena had short black hair.
This court cannot say that the failure to file a motion to strike Mr. Pugh's testimony resulted in ineffective assistance of counsel. Mr. Pugh's testimony was not irrelevant as posited by appellant. Mr. Pugh found a plastic bag with black hair and "decomposing meat" which smelled bad. This bag was found buried near appellant's house. Moreover, when describing the length of a person's hair, the terms long or short are relative. Even someone that is described as having short hair may have hair that is twelve inches long from end to end. Regardless, the weight to afford such evidence is a jury question and not one that is to be resolved by striking testimony that is rebutted by later testimony.
Appellant's third allegation of ineffective assistance of counsel claims that his defense required an expert on Indian culture and a more in-depth cross-examination of the Indian witnesses to explain why Rena may have been motivated to disappear. Appellant fails to specify what information such an expert or in-depth cross-examination would reveal. Moreover, defense counsel need not pursue every possible trial strategy.State v. Brown(1988), 38 Ohio St.3d 305, 319. See, also,Clayton, supra at 49 (holding that counsel's decision to call certain witnesses is tactical). Accordingly, these allegations do not rise to the level of deficient and unreasonable lawyering which resulted in a prejudice to the accused. See Coleman, supra at 308-09.
Appellant's fourth allegation of ineffective assistance of counsel complains that defense counsel failed to edit the taped interview properly. Before the tape was played to the jury, appellant object to the last few seconds of the tape which contained Sheriff Sirianni saying, "May 27, 1987. Just now leaving. No doubt in my mind." This statement was responded to by Deputy Denzil Knowlton who commented, "None now." The state and the court agreed that these statements should be redacted. However, the tape was played for the jury without redaction. Such omission was error by defense counsel; however, we cannot say that it was the type of "serious error" required before labeling counsel's performance deficient. Moreover, the result of the trial would not have been altered had the redaction been made.
Appellant's fifth allegation of ineffective assistance of counsel criticizes defense counsel for failing to cross-examination BCI agent Henry about his qualifications to give an opinion on whether Rena is dead or missing. We refer appellant to our reasoning under his sixth assignment of error explaining why Agent Henry was qualified and why his testimony was not prejudicial. Moreover, the Supreme Court has held that failure to object to expert's qualifications is not ineffective assistance of counsel. State v. Davie(1997), 80 Ohio St.3d 311, 332. As the state suggests, attacking an expert's qualifications is often a bad strategy since it permits the witness to enhance his qualifications beyond the basic foundation laid by the state. Therefore, defense counsel's assistance was not ineffective in this instance.
Appellant's sixth allegation of ineffective assistance deals with counsel's failure to object to a remark made in the state's opening which was never proved in trial. During opening statements, the prosecutor stated that Rena had paid her rent a year in advance. However, Rena's landlord testified that after Rena's disappearance, appellant paid the back rent owed. Appellant argues that his attorney's failure to comment on this discrepancy constitutes ineffective assistance. We disagree and hold that defense counsel's failure to move to strike a portion of the state's opening is not deficient performance. It is reasonable for the attorney to have decided that the landlord's testimony by itself was enough to dispel the state's inaccurate representarion Moreover, the state's misstatement is not prejudicial in light of the landlord's testimony.
Appellant's seventh allegation of ineffective assistance of counsel deals with a taped interview of appellant conducted by Officer Martin Kendzora, constable of Richland Township Police Department and chief of the St. Clairsville Police Department. Officer Kendzora testified that when he and two other officers interviewed appellant in March 1987, they taped the interview but no new information was obtained. Defense counsel moved for a mistrial based upon the fact that they did not have an opportunity to listen to the taped interview because the tape given to the defense was inaudible. The state responded that on August 15, 1996, a letter was sent to defense counsel advising them that they can go to the sheriff's office if they would like to listen to the original tape on amplifying equipment. The state's letter said that the original tape cannot be of any worse quality than the one in defense counsel's possession. Defense counsel did not attempt to listen to the original because they misinterpreted the state's letter as meaning that the original was just as bad as the copy. The court denied a mistrial and told defense counsel that they had more than two months notice that the tape was available for their listening.
Assuming arguendo defense counsel acted unreasonably by failing to go to the sheriff's office to listen to an enhanced version of the taped interview, appellant does not allege how the failure to listen to the tape prejudiced his defense. If the tape contained information beneficial to the defense, then appellant would have revealed such information to this court to establish prejudice. There is nothing in the record to indicate that the result of the trial would have been different had defense counsel listened to the tape. Therefore, this error by defense counsel does not constitute ineffective assistance of counsel.
Appellant's eighth allegation of ineffective assistance concerns a misstatement by defense counsel. During the cross-examination of Officer Kendzora, defense counsel asked Officer Kendzora to read appellant's voluntary written statement from November 22, 1985 which restated appellant's prior story to the police concerning Rena's disappearance. Thereafter, the following statements were made:
 "Q. Okay. The interview that was conducted of David Christman on November 22, 1985, were there notes kept of that interview other than the written confession of my client?
 A. I don't know what you refer to as a written confession.
Q. Well, written statement.
A. Written statement, yes.
 Q. Thank you for correcting me, because he didn't confess to anything.
 A. No, sir, there was no notes. All we wanted to do was reiterate what we had.
 Q. All right. And the November 22, 1985 interview of my client, where he gave that voluntary statement, were there any notes kept of that?
 A. No, sir, we just took a voluntary statement."
* * *
 Q. And in two hours time, all you obtained was a half page of writing?
 A. Well, if the exact time was added, yes, that's all we received from him." (Trial Tr. II-89-90)
Appellant argues that he was denied effective assistance of counsel due to the question about a written confession when in fact there existed no such document. It is obvious that defense counsel made a mistake in choosing his words. However, as is apparent from the above transcription, counsel rectified his mistake. Moreover, Officer Kendzora corrected defense counsel. From the context of the cross-examination and the prior reading of the voluntary statement into the record, the jury was sufficiently apprised that defense counsel's slip was a mere misstatement. Accordingly, this error was not so severe that our confidence in the outcome of the trial is shaken.
Appellant's ninth allegation of ineffective assistance of counsel revolves around a juror who was not challenged by defense counsel. Appellant claims that Vicki Conger should have been challenged for cause for two reasons. First, appellant contends that Ms. Conger was biased because she was employed as a dietary manager at the Monroe County Care Center, which is county owned but privately managed. However, the mere fact that a potential juror is employed by the government is not a reason to challenge that juror for cause. Morford v. United States(1950),339 U.S. 258. See, also, Dayton v. Gigandt(1992), 83 Ohio App.3d 886, 892
(holding that a juror is not disqualified solely because he works for the city in an occupation which is unrelated to the case);State v. McKinney(1992), 80 Ohio App.3d 470, 476-77 (holding that state employee is not disqualified absent actual bias)
Appellant also alleges that Ms. Conger's background tainted her ability to serve impartially. It was disclosed on voir dire that at the time of Rena's disappearance, Ms. Conger's future husband was with a group of hunters who found a purse which they turned over to the police. Ms. Conger stated that the police examined the purse and came to the conclusion that it was not Rena's. Ms. Conger responded affirmatively when the trial court asked her if she could set aside any information gained from her "husband and make decision based solely on the evidence presented.
The court was satisfied that Ms. Conger could render and impartial verdict according to the law and evidence submitted to the jury at trial. See State v. Phillips(1995), 74 Ohio St.3d 72,86 (holding that it is not ineffective assistance of counsel to fail to challenge a juror in a death penalty case for cause if that juror was not substantially impaired from following the law) See, also, State v. Rogers(1985), 17 Ohio St.3d 174. There is nothing in the record of jury selection to indicate that Ms. Conger held an opinion which made her partial. See State v.Warner(1990), 55 Ohio St.3d 31, 47 (placing the burden on the challenger to show that a juror has a preformed opinion or bias) Because there existed no grounds upon which to exclude Ms. Conger for cause pursuant to R.C. 2945.25 and Crim.R. 24, appellant was not denied effective assistance of counsel by the failure of his counsel to enter such a challenge.
Although defense counsel could have exercised a pre-emptory challenge to remove Ms. Conger, this is a strategical decision which we refuse to second-guess. See Carter, supra at 558 (stating that there is a strong presumption of sound trial strategy). See, also, State v. Simms(1969), 20 Ohio App.2d 329, 330-32(holding that it is not ineffective assistance of counsel to allow a person employed as deputy clerk of the county municipal court to remain on the jury). For the preceding reasoning, this court concludes that defense counsel did not provide ineffective assistance of counsel. This assignment of error is overruled.
 XII. ASSIGNMENT OF ERROR NO. ELEVEN
Appellant's eleventh assignment of error contends:
 "THE PROSECUTING ATTORNEY IS GUILTY OF SUCH MISCONDUCT AS TO PREVENT APPELLANT FROM HAVING AN ADEQUATE RECORD FOR APPEAL DUE TO HIS FAILURE TO SEAL HIS RECORDS FOR PURPOSES OF APPELLATE REVIEW."
While the jury was deliberating, appellant asked that the state's file be sealed and delivered to the trial court. The reasoning behind this request was to preserve the file for determination of whether it contained undisclosed exculpatory evidence. The following colloquy followed:
 "MR. YOSS: I'm happy to put the entire file in a box and give it to the Court.
 THE COURT: I guess that does it then, doesn't it? That puts it under seal. I mean, when this thing is over with, put the entire file in a box and give it to me, then I'll give it to John and he can do something with it. And we'll do that. Okay. Motion granted. (Trial Tr. VI-118)
On January 8, 1998, appellant's counsel asked to view the state's file but was advised that such file had never been presented to the court. The next day, the state delivered their file to the court and entered a stipulated order which granted appellant's counsel access to the file. Appellant claims that the fourteen month delay in transmitting the file to the court prejudiced his appeal and asks for a retrial.
The state informs us that Mr. Yoss completed his term as prosecutor shortly after appellant's trial. Before leaving office, Mr. Yoss transferred his files to the new prosecutor without transmitting appellant's file to the court. When this oversight was called to the attention of the new prosecutor, he immediately corrected Mr. Yoss's oversight.
Normally, a defendant must make a specific allegation of the existence of suppressed exculpatory evidence before the court may order the state's file sealed. State v. Lawson(1992), 64 Ohio St.3d 336,343; State v. Patterson(1971), 28 Ohio St.2d 181. Such specificity is not required in the case at bar because the prosecutor consented to the sealing of his file. Thereafter, either the trial court or the appellate court may conduct an in camera inspection to determine if the state's file contains material exculpatory evidence. See Id. This procedure is unnecessary in the case at bar as the prosecutor granted appellants counsel access to the state's file the day after appellant requested it. As the state posits:
 "Obviously, if anything of an exculpatory nature or of other relevance to his appeal were contained in the file, appellant's counsel would have called it to this court's attention. He has not done so."
There is no suggestion that during the delay in sealing the record, exculpatory evidence was removed from the file. Accordingly, appellant has failed to demonstrate how he was prejudiced by the state's inadvertence. This assignment of error lacks merit.
 XIII. ASSIGNMENT OF ERROR NO. TWELVE
Appellant's twelfth and final assignment of error alleges:
 "THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THERE IS NO SUBSTANTIAL EVIDENCE UPON WHICH A TRIER OF FACT COULD REASONABLE (sic) CONCLUDE THAT THE ELEMENTS OF THE OFFENSE HAD BEEN PROVEN BEYOND A REASONABLE DOUBT."
Weight of the evidence concerns the effect of the evidence in inducing belief. State v. Thompkins(1997), 78 Ohio St.3d 380,387, quoting State v. Martin(1983), 20 Ohio App.3d 172, 175. In order to reverse a verdict as being against the manifest weight of the evidence, a reviewing court must determine that the jury clearly lost its way and created a manifest miscarriage of justice. Id. A verdict is reversed on these grounds only in exceptional circumstances. Id. This is because credibility of witnesses and weight of the evidence is primarily a question for the trier of fact. State v. DeHass(1967), 10 Ohio St.2d 230,231.
As we reviewed the record, we highlighted the many pieces of evidence which tend to induce belief in appellant's guilt. For instance, two witnesses heard appellant speak of hiring someone from Wheeling to kill Rena. Three witnesses heard appellant talk about the disposal of a body before Rena's disappearance. Appellant made what can be considered an incriminating statement to his sister about moving a body. He told a woman that he buried half of Rena under his hot tub and fed half of her to the hogs. He told another woman who angered him that she would be gone like Rena. Moreover, two witnesses saw appellant and one witness believes he heard appellant's car in Woodsfield at the time which appellant claimed he was shopping in St. Clairsville. The state presented evidence that appellant told different versions of Rena's disappearance to different people. Appellant's brother testified that Rena and appellant argued shortly before she went missing. Furthermore, appellant's behavior the day after Rena's disappearance was inappropriate in that he was planning to clean out her apartment. There are various reasons to believe that Rena would not have gone to the mall that day and did not voluntarily disappear. Lastly, appellant did not exhibit interest in the police investigation of his wife's disappearance.
After reviewing the entire record, including the circumstantial evidence and the inferences which can be drawn from it, we refuse to sit as a "thirteenth juror" who claims that the jury clearly lost its way when it chose to belief the testimony which incriminated appellant. The greater amount of credible evidence was presented by the state. Accordingly, the verdict was not against the manifest weight of the evidence. This assignment of error is overruled.
For the foregoing reasons the judgment of the trial court is affirmed.
Cox, P.J., concurs. Waite, J., concurs.
APPROVED:
 ___________________________________ JOSEPH J. KOVICH, JUDGE